Louise Griswold, Appellee, v. Chicago Railways Company et al., Appellants.

Gen. No. 33,278.

500

Opinion filed June 26, 1929.

GEORGE W. MILLER and ARTHUR J. DONOVAN, for appellants; FRANK L. KRIETE and JOHN E. KEHOE, of counsel.

JAMES C. McSHANE, for appellee.

MR. PRESIDING JUSTICE WILSON delivered the opinion of the court.

Plaintiff, Louise Griswold, brought her action against the Chicago Railways Company, Chicago City Railway Company, Calumet and South Chicago Railway Company and The Southern Street Railway Company, corporations, doing business as the Chicago Surface Lines, defendants, to recover damages by reason of personal injuries sustained on the evening of September 18, 1926.

Plaintiff charged in her declaration that her injuries were caused by the negligent operation of a car operated by the agents and servants of the defendants. A trial resulted in a verdict in favor of the plaintiff for the sum of $25,000, upon which judgment was entered and an appeal prayed and allowed to this court.

From the facts it appears that the plaintiff was a passenger upon a southbound Halsted street car which was being operated by the defendant company in the City of Chicago. This car proceeded as far south as 79th Street, an east and west street, and at that point switched over onto the 79th Street tracks and proceeded in an easterly direction. It was the intention of the plaintiff, who was accompanied by her daughter, to proceed a considerable distance south of 79th Street and, for that purpose, took a transfer with the intention of transferring to a southbound car, when the car upon which she was riding reached 79th Street.

It appears that at this point there was a safety zone, provided for passengers, but there is no testimony to the effect that it was placed there by the defendants or that they had anything to do with its location. It appears also that this corner is a busy business corner in the City of Chicago and there were stop lights for the purpose of regulating traffic at that street intersection.

When the car upon which plaintiff was riding reached 79th Street it came to a full stop and the plaintiff and five or six other passengers alighted from the front end and upon the west side of the car. At this time the traffic lights were set for north and south traffic and there were a number of automobiles proceeding in a southerly direction over and along Halsted Street, between the street car and the sidewalk on the west side of Halsted Street. When the car came to a stop, its front end was about opposite the switch points by which the car would be turned eastward into 79th Street, and about 11 feet south of the south end of the safety zone. The distance from the west rail of the southbound track to the west curb of Halsted Street is 16 feet 7 inches.

When the car came to a stop, it is apparent that the front of the car was very close to the crosswalk on 79th Street, so that when the plaintiff alighted, she was apparently about midway between the crosswalk and the south end of the safety zone. It appears, moreover, that this was the last trip for this car and all of the passengers were required to alight at that point as the car proceeded around to the east on 79th Street and from there to the car barns.

The car in question was about 48 feet long with an overhang over the rail of 2 feet 2 inches. It appears that as this car proceeded around the curb, the rear end began to diverge over the line of the normal overhang until it reached a maximum of approximately

3 feet over the normal overhang at a point about 3 feet south of the switch point or the beginning of the curve.

On the night in question after plaintiff, with others, had alighted at this particular point and was standing alongside of the car, apparently waiting for the automobile traffic to pass, the car proceeded to swing around the corner and, by reason of the divergence of the rear end of the car, the plaintiff was struck and knocked down and sustained the injuries in question. There is considerable testimony in the record to the effect that a number of other people, standing at this particular point, were also struck by the car in the course of its progress.

After the accident plaintiff was picked up and carried to the sidewalk and from there taken to the Auburn Park Hospital, where Dr. Huntington was called and attended her within an hour after the accident. From there, on the following day under the orders of the physician, she was removed to the Roseland Community Hospital. It appears that she had sustained extensive abrasions and bruises about her body and a fracture of the upper part of the femur— the neck. She was placed on a special frame and the foot which was turned outward was corrected, and a plaster cast from the ribs down to and including the foot on the left side was applied. Heavy bandages were tied to the ankle and a turnbuckle used to pull the leg down to the proper length. She remained in this cast for eight weeks suffering a great deal of pain and was very nervous, requiring the application and use of sedatives. The cast was removed November 15, and thereupon it appeared that there was not a firm union and wooden splints from the armpit to the left foot were fastened upon the body and the leg to prevent movement. This was kept on about four weeks and then a special steel splint applied in place of the

wooden splints and she remained in this for about three months. This steel splint had a bar coming down from between the two shoulders, taking a turn at the region of the hip and coming down the back of the leg beyond the heel and was held in place by two large leather straps. This steel splint was taken off sometime in March of the following year, when it was found that the knee was completely anklylosed.

Plaintiff left the hospital about the middle of April, 1927, and daily massage treatments were required. She was only able to get around with the use of two crutches. Plaintiff continued to suffer considerable pain during this time. As the result of the injuries plaintiff suffered a limitation of motion in the hip and knee joint and a shortening of approximately one-half inch of the left leg. The condition is permanent.

At the time of the accident plaintiff was a woman 50 years of age, apparently in good health, although slightly hard of hearing, as a result of scarlet fever suffered a number of years previous. While in the hospital she lost approximately 20 pounds in weight. For some time prior to May, 1928, according to the testimony of the attending physician, her general physicial condition was good, but her mental condition was bad and she worried a great deal, but did not complain much of pain. In May, 1928, she suffered a stroke of apoplexy. Dr. Huntington was called in immediately after the stroke and found her unconscious with complete paralysis of the right arm and right leg. She was immediately taken to the hospital, where she remained about seven weeks. She regained to a considerable extent the use of her arm and leg and was able to grasp objects with the hand and to walk with assistance. Dr. Huntington testified that in his opinion the stroke was the result of high blood pressure, resulting from the worry arising out of her condition caused by the accident.

Plaintiff rests her case upon the theory that the defendants, by their servants and agents, were guilty of negligence in operating the car around the curve at the point in question, knowing that the rear end of the car would swing out to the west and strike the plaintiff and further that plaintiff had been placed in said position by the servants of the defendants who were, therefore, fully cognizant of her position, and were guilty of negligence in having placed her in a position where she was liable to sustain injuries when the car undertook to move forward and around onto 79th Street. Plaintiff testified that it was her intention to transfer at this point and take another car, but before doing so she intended to make a purchase at a fruit store on the corner. This fact is urged at some considerable length for the purpose of establishing the fact that at the time of the accident she was not a passenger, but it does not appear that plaintiff's case is based upon the relationship of carrier and passenger except in so far as it becomes the duty of a carrier to provide a passenger a proper and safe place at which to alight from the car. Even though the plaintiff was not possessed of a transfer nor had intended to continue her journey, nevertheless, there is an obligation on carriers to exercise care in providing those who were passengers with an opportunity to alight from a car in a proper and safe manner. The obligation of carrier and passenger does not entirely cease the moment a passenger steps off a car and, while it may not be that the highest degree of care is required, still proper care under such circumstances would be such, under all the surrounding circumstances, as would require the furnishing of a reasonably safe place for passengers to alight and to exercise proper care for their safety immediately thereafter. *Chicago Terminal Transfer R. Co. v. Schmelling,* 197 Ill. 619; *Pennsylvania Co. v. McCaffrey,* 173 Ill. 169.

It is argued at considerable length that by stepping forward about a step or two plaintiff could have avoided the outward swing of the rear end of the car, but it should be borne in mind that during this time automobiles were passing between plaintiff and the sidewalk toward which she intended to proceed and what was reasonable care on her part was a question of fact for the jury. It may have been, that by stepping forward away from the swing of the car she may have stepped into the line of traffic. These were all questions particularly for the consideration of a jury.

The cases cited by counsel, where people stepped in the way of a car swinging around a corner, are cases of pedestrians on the street to whom the carrier did not owe the same duty or obligation that they would toward one who had been a passenger on the car and placed in the particular position that plaintiff was at the time of the accident.

The correct rule, we believe, is found in the case of *Kelly v. Chicago City R. Co.*, 283 Ill. 640. From the facts in this case it appears that plaintiff, with others, presented himself at a proper place near a street intersection for the purpose of taking passage on an oncoming car. The motorman saw them standing there for that purpose and with knowledge of such fact failed to stop his car, but continued on around the curve onto the intersecting street with the result that the overhang of the car, in making the turn, struck the plaintiff. The court in its opinion said:

"Under these circumstances the slackening of the speed of the car might well have been understood by appellee and the others present as indicating an intention on the part of the motorman to bring his car to a full stop before rounding the curve and have caused appellee to remain in closer proximity to the car than he otherwise would. Had the motorman brought his car to a full stop, as his actions indicated he intended

to do, there is no question but that the accident would not have happened.''

It may be well said in the case at bar that the motorman had knowledge that the plaintiff and others had alighted at this particular point, and it was his duty to wait until they had reached a place of safety before undertaking to cause the car to swing around the curve onto 79th Street.

It is urged as a ground for reversal that a hypothetical question was put to a medical expert in which it was assumed that from the time of plaintiff's injury, down to the time of the stroke, she had suffered a great deal of pain from the broken hip. It is insisted that the evidence shows that for some time prior to the stroke, she was free from physical pain. This is based on the testimony of the attending physician who testified that after she left the hospital her general physical condition was good, but that her mental condition was bad and that she worried a great deal, but did not suffer much pain and did not complain much. It might be argued from this answer of the witness that she did suffer some pain. However, it is evident that, during a large period of time, from the accident to the time of the stroke, she suffered pain accompanied by mental worry. The attending physician also testified that, in his opinion, the stroke was the result of worry arising out of her condition after the accident and not the result of pain, so that the important fact established was whether there was sufficient evidence as to her condition from which a jury could find that the stroke of apoplexy was attributable to the accident. If this stroke of apoplexy was caused by worry, and the worry was produced as a result of the accident, there would be a logical connection which should be submitted to the jury independent of the question as to whether or not she was suffering pain prior to the apoplectic stroke. The jury was instructed on behalf of the defendants that the burden was upon plaintiff to show by

a preponderance of the evidence, not only that such ailments existed, but that they were the result of the accident. It is proper for a court to permit the proving of the condition of health at and prior to the time of the injury, followed by proof showing the physical condition from that time on until the time of the trial and submit the question of the cause of her then physical condition to a jury as a question of fact to be determined by them. *Chicago Union Traction Co. v. May,* 221 Ill. 530.

An examination of the objection to the hypothetical question shows a number of specific objections, but not on the particular question as to the continuance of pain at the time of the accident down to the time of the apoplectic stroke. Counsel for defendants had a right to point out this particular objection in order to correct the question. Moreover, all the facts in the case were before the jury and they had a right to reject this testimony if in their opinion an essential element was included, concerning which there was no evidence. Moreover, the defendants had ample opportunity on cross-examination to have called the attention of the witness to this particular element incorporated in the question. We do not believe there was error sufficient, in view of the length of the trial and the number of witnesses testifying, to justify a reversal on this ground.

Objection is made to the admission of certain X-ray pictures in evidence on the ground that they had not been properly identified as accurate representations of that part of plaintiff's anatomy, which they purported to portray. These pictures were taken in the hospital in September, 1926, very shortly after the accident. They were taken for the purpose of guiding the attending physician in the treatment of the fracture and not for the purpose of presentation in court. If they were sufficient for the attending physician to rely upon in his diagnosis of the injury, they should

be sufficient for a jury in their consideration of the case. Moreover, they were taken by the witness Myrtle Jones, a witness who testified that she had been in the X-ray business eight years and connected with the Roseland Community Hospital, and had taken approximately 11,000 pictures in the prior three years. She did not remember how many she had taken before that time. She stated that they were taken on a Standard machine and that she had taken a great many films of fractured hip bones; that the films were the regular, usual Standard films, showing the condition of the left pelvis and the upper third of the femur. The skiagraphs after being admitted in evidence were used and examined by expert witnesses on behalf of the defendants, and these witnesses testified fully as to the facts they found after reading the skiagraphs, so that from the record it is apparent that a part of the defense was based upon these same pictures to which objection was made after their introduction by the plaintiff.

The refusal of the court to give instruction No. 2, on behalf of defendants, was not error. This instruction directed the jury to find that if plaintiff changed her position after the front of the car had passed the point where she was standing, and thereby brought herself in contact with the rear end of the car as it rounded the curve, that she could not recover. This was a directory instruction, and properly refused. The jury had a right to consider all the surrounding circumstances, and it may well have been that when she stepped off of the front end of the car she may have been confronted with circumstances which might have required her to step back and which should have been anticipated by the defendants in the operation of the street car which caused the accident. The jury was fully instructed that if the plaintiff in any way, by her negligence, caused or proximately contributed to cause the accident, then she could not recover. This was a

general instruction under which the jury could have taken into consideration the question as to whether or not her stepping backward, if she did step backward, into a position where she was injured, was such negligence on her part as contributed to the accident. This was a sufficient instruction for the jury without singling out and calling to its attention this particular isolated fact.

We find in the record ample evidence to sustain the verdict of the jury and, after a consideration of the extent of the injuries, we are not prepared to say that the damages are excessive.

For the reasons stated in this opinion, the judgment of the superior court is affirmed.

*Judgment affirmed.*

HOLDOM and RYNER, JJ., concur.